**The below described is SIGNED.**

**Dated: August 14, 2006**

_____
**JUDITH A. BOULDEN
U.S. Bankruptcy Judge**



_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: <br><br> CRAIG ROSS ANDERSON and <br> MELISSA ANNE ANDERSON <br><br> Debtors. | Bankruptcy Number: 04-29079 <br><br> Chapter 7 |
| DEBRA A. SHAW; MARILYN BARRINGER-THOMSON; UNITED STATES OF AMERICA EX REL. DEBRA A. SHAW, <br><br> Plaintiffs, <br><br> vs. <br><br> CRAIG ROSS ANDERSON, <br><br> Defendant. | Adversary Proceeding No. 04-2799 <br><br> Judge Judith A. Boulden |

**MEMORANDUM DECISION ON DEFENDANT'S
MOTION TO ENFORCE SETTLEMENT AND REQUEST FOR ATTORNEY FEES**

Before the Court is the Defendant's Motion to Enforce Settlement and Request for Attorney Fees (Motion) that came on for hearing on July 28, 2006. The sole issues for determination are whether an oral settlement agreement was reached as to this adversary proceeding; if so, what the material terms of that settlement are; and whether to enforce the terms of such settlement. This is a core matter and the Court may enter a final order.[1] The Court has considered the evidence properly before it, has judged the credibility of the witnesses, and has made an independent inquiry into applicable case law. Now being fully advised, the Court hereby enters the following Memorandum Decision.

## I. BACKGROUND

In this adversary proceeding filed on September 7, 2004, the Plaintiffs Debra A. Shaw (Shaw) and Marilyn Barringer-Thomson (Thomson) sought a nondischargeability judgment against the Defendant Craig Ross Anderson (Debtor)[2] under § 523(a)(4) and (a)(6) of the Bankruptcy Code for alleged efforts to frustrate the Plaintiffs' judgment collection activities.[3] The underlying judgment arose in connection with Shaw's *qui tam* and wrongful termination actions against AAA Engineering & Drafting, Inc. (AAA), Wilbur L. Brakhage (Brakhage), and Janice Keelin (Keelin) in Oklahoma under the False Claims Act. To date, no judgment has been

---

[1] The Plaintiffs suggested in their pleadings that consideration of the Motion may not be a core matter, even though it involves resolution of a nondischargeability action. As such, it is clearly core under 28 U.S.C. § 157(b)(2)(A), (I), and (O). The Court explicitly ruled regarding the core nature of this proceeding in its opening statement to the parties before the evidentiary presentation began, and no party challenged the ruling during the hearing.

[2] For ease of reference, the Court will refer to the Defendant in this adversary proceeding as the Debtor.

[3] Barringer-Thomson is both a plaintiff in her own name and lead counsel for the Plaintiffs in this adversary proceeding.

entered against the Debtor with respect to any of Shaw's False Claims Act litigation, so Plaintiffs must independently prove all elements of their § 523(a)(4) and (a)(6) action, including the existence of a claim against the Debtor. The substantive False Claims Act judgment against AAA, Brakhage, and Keelin has been satisfied, and the only amounts still allegedly owing to Shaw and still the subject of litigation are for "related judgments awarding costs and attorneys' fees . . . ."[4] The first suit in the lengthy and contentious history of the False Claims Act litigation was filed over a decade ago by Shaw as relator for the United States, and there are various related ongoing proceedings in the United States District Court for the Western District of Oklahoma and the Tenth Circuit Court of Appeals.

Against this backdrop, Todd Jensen (Jensen) as settlement negotiation counsel for all defendants in all proceedings related to Shaw's False Claims Act litigation (Settling Defendants and Proceedings, respectively) and Barry Johnson (Johnson) as then-local Plaintiffs' counsel, engaged in settlement discussions concluding on April 28, 2006. Johnson and Jensen called Michael Gray (Gray), counsel for many of the Settling Defendants in the underlying False Claims Act litigation, immediately after a "global settlement" was allegedly reached to inform Gray of its material terms and task him with drafting the settlement documents. Gray testified that Johnson and Jensen gave him a "brief explanation" of the material terms of the global settlement which, because he was in his car during the phone call, he scribbled down on a random piece of

---

[4] *Shaw v. AAA Engineering & Drafting, Inc., et al.*, 138 Fed.Appx. 62 (10th Cir. 2005) (affirming, *inter alia*, the District Court's denial of Shaw's attempt to add additional defendants and amend judgments in the original actions). For additional history of Shaw's False Claims Act litigation, *see also Shaw v. AAA Engineering & Drafting, Inc., et al.*, 213 F.3d 519 (10th Cir. 2000); *Shaw v. AAA Engineering & Drafting, Inc., et al.*, 213 F.3d 538 (10th Cir. 2000); and *Shaw v. U.S., et al.*, 213 F.3d 545 (10th Cir. 2000).

paper. Using this "hit sheet," he then began putting the material terms into complete sentences and added boilerplate language that he culled from other unrelated settlement agreements with which he had been involved. He made clear that he would do his best to complete a draft by Monday, May 1 but made no guarantees as to the draft's completion date. Johnson, Jensen, and Gray all testified that the oral agreement of April 28 was modified in certain respects at some point between April 28 and May 4,[5] although one of the terms of these modifications is disputed as discussed below. The first draft was not completed until May 4, 2006.

It is undisputed that at 11:08 p.m. Mountain Time on Friday, April 28, 2006, Barringer-Thomson filed a Notice Regarding Settlement and Request for a Temporary Stay of Deadlines (Notice) in this adversary proceeding in which she represented the following:[6]

3. Todd Jensen, Michael Gray, and Plaintiffs' local counsel, Barry N. Johnson, as of approximately 4:15 p.m. MST, April 28, 2006 <u>consummated the material terms of a settlement agreement intended to resolve all issues among all parties involved in the Proceedings</u>. The settlement agreement will obviate the need for the evidentiary hearing presently scheduled in connection with the Trustee's objection to Plaintiffs' claim and will resolve all issues and claims included in the Plaintiffs' Adversary case.
4. The settlement discussions included the parties' <u>expectations</u> that settlement documents and related approval motions will be completed sometime during the week of May 1-5, 2006.
5. In light of the <u>pending settlement and the parties' expectations to conclude settlement documents within a week</u>, Plaintiffs request a temporary stay of all deadlines in this case, including the deadline to file hearing exhibits and other information relating to the May 8, 2006 hearing scheduled in the Chapter 7 case and all deadlines set by the Court in Plaintiffs' Adversary case. (emphasis added)

---

[5] The witnesses were inconsistent or unclear on the exact date and time of the agreed modifications, but all of them testified that some such modifications did occur.

[6] The Notice was also filed in the main bankruptcy case at 11:06 p.m.

The Notice concluded by stating that the Plaintiffs request an extension of all deadlines in the main bankruptcy case and this adversary proceeding so that the parties' attorneys could "prepare and submit documents consistent with the settlement terms agreed to on Friday."

Based on these representations, the Court entered its Stipulated Order Granting Temporary Stay (Stay Order) on May 3, 2006 continuing various deadlines in both the main bankruptcy case and this adversary — including but not limited to the May 4 deposition of Barringer-Thomson; the May 8 hearing on the Trustee's Objection to Proof of Claim #13 and Limited Objection to Motion for Relief from Stay and document filing deadlines related thereto; and the unspecified deadline for the Plaintiffs to respond to the Debtor's Motion for Summary Judgment. The adversary proceeding was nearing readiness for trial at the time the Stay Order was entered, so the May 9 parties' planning meeting; the May 23 pretrial order due date; and the June 12 final pretrial conference were continued as well. Finally, the Court reset the June 12 final pretrial conference as a status conference in case the adversary proceeding had not been dismissed prior to that date.

Barringer-Thomson testified at the Motion hearing that when she first received a draft of the Settlement Agreement on May 4, 2006, she found it "not consistent with the material terms and conditions that were negotiated on April 28, 2006." She admitted to withdrawing any further negotiating authority from then-local counsel Johnson following her review of the draft and allegedly denied that any agreement had been reached. This denial first came during an hour-long phone conversation between Jensen and Barringer-Thomson on May 4 in which they discussed Barringer-Thomson's issues with the written draft. Barringer-Thomson also spoke with Gray on or about May 22, 2006. During this conversation, Gray requested that

Barringer-Thomson provide him with written comments so that he could make satisfactory changes to the draft and offered for her to come to his office so that they could hammer out any remaining issues.

No written comments were ever provided by Barringer-Thomson, no settlement documents were ever completed and signed, and none of the allegedly objectionable draft provisions were ever changed except those involving the release of claims by the United States.[7] Gray and Barringer-Thomson were also never able to meet and confer in person due to scheduling difficulties. The Debtor ultimately filed the Motion on June 2, 2006 seeking to enforce the agreement that he contends was reached on April 28, 2006 as modified between that date and May 4, 2006. The June 12 status conference was then held as scheduled, during which the current Motion hearing was set.

## II. SETTLEMENT AGREEMENT

### A. EXISTENCE

The first issue is whether an oral settlement agreement was reached with respect to this adversary proceeding. Under Utah law, courts will enforce settlements "if the record establishes a binding agreement [by a preponderance of the evidence] and the excuse for nonperformance is comparatively insubstantial."[8] The Utah Court of Appeals has also stated that "[i]t is of no legal

---

[7] The Plaintiffs correctly point out that these changes were not made until after the Motion was filed, but this is irrelevant as the Court will discuss below.

[8] *Zions First Nat'l Bank v. Barbara Jensen Interiors, Inc.*, 781 P.2d 478, 479 (Utah Ct. App. 1989); *see also Sackler v. Savin*, 897 P.2d 1217 (Utah 1995); *Murray v. State*, 737 P.2d 1000 (Utah 1987); *John Deere Co. v. A & H Equipment, Inc*, 876 P.2d 880 (Utah Ct. App. 1994); *Goodmansen v. Liberty Vending Systems, Inc,* 866 P.2d 581, 584-85 (Utah Ct. App. 1993). Of course, "[i]ssues involving the formation and construction of a purported settlement agreement are resolved by applying state contract law." *Shoels v. Klebold*, 375 F.3d 1054, 1060 (10th Cir. 2004).

consequence that the parties have not signed a settlement agreement" and that "[p]arties have no right to welch on a settlement deal during the sometimes substantial period between when the deal is struck and when all necessary signatures can be garnered on a stipulation."[9]

Although the Plaintiffs' pleadings filed in connection with the Motion set forth a wide array of possible defenses to the existence of an agreement, the evidence and argument presented at the Motion hearing — including Barringer-Thomson's own testimony — made clear that an oral agreement was actually reached between the parties through their duly authorized counsel at approximately 4:15 p.m. on April 28, 2006.[10] Accordingly, the Court finds, based upon all the evidence presented, that a binding oral agreement was reached between the parties on April 28, 2006.

## B. SUBSTANCE

The true heart of this dispute centers not on whether there was an agreement but what its material terms are, yet both sides appear to misunderstand the Court's task with respect to

---

[9] *Goodmansen*, 866 P.2d at 584-85 (Utah Ct. App. 1993). This Court ruled in its opening statement that Utah rather than Oklahoma law applied to consideration of the settlement agreement based on the "most significant relationship" test, and the parties did not challenge this ruling. Even so, the Court notes that its own review of Oklahoma law demonstrates no appreciable difference with respect to the enforcement of oral settlement agreements. *See, e.g.*, *Russell v. Board of County Commissioners of Carter County*, 1 P.3d 442 (Okla. Civ. App. 2000) (discussing the desirability and enforceability of oral settlement agreements in the absence of fraud, duress, undue influence or mistake); *Coulter v. Carewell Corp.*, 21 P.3d 1078 (Okla. Civ. App. 2001) (involving a motion to compel enforcement of a settlement).

[10] The Plaintiffs raised an issue at the hearing regarding Jensen's authority to act on behalf of all the Settling Defendants, including the Debtor, but the Debtor's counsel stated on the record that the Debtor did not question Jensen's authority. The Plaintiffs' allegations are also inconsistent with their representations in paragraph 1 of the Notice, Johnson and Barringer-Thomson's testimony regarding their alleged concerns about Jensen's authority during the negotiation process, and Jensen's own testimony regarding the scope of his authority. At any rate, "[i]t is well-established under Utah law that subsequent affirmance by a principal of a contract made on his behalf by one who had at the time neither actual nor apparent authority constitutes a ratification, which in general is as effectual as an original authorization." *Bullock v. State*, 966 P.2d 1215, 1218 (Utah Ct. App. 1998) (internal citations omitted).

discerning the material terms of the parties' agreement. The Debtor asks the Court to enforce the written draft attached to his Supplemental Filing in Response to the United States' Limited Objection to Motion to Enforce Settlement Agreement, while the Plaintiffs believe that the Court would need to go through the written draft line by line in order to resolve the Motion if the Court were to rule in the Debtor's favor. Neither position is correct.

The binding contract at issue is the parties' *oral* agreement, and, having found that a binding oral agreement was in fact reached, the Court now proceeds to make findings of fact of the material terms of that oral agreement. Therefore, any written drafts of the agreement are irrelevant as this point in the proceedings. Accordingly, based upon all the evidence presented, and considering the credibility of the witnesses, the Court makes the following findings as to the seven material terms orally agreed to by the parties.

**1. MATERIAL TERM #1 — The Settling Defendants, which include Brakhage and Keelin, shall pay the Plaintiffs $254,900 (Settlement Amount).**

Although the testimony was inconsistent with respect to exactly when the original agreement of April 28 was modified to increase the Settlement Amount from $250,000 to $254,900 in exchange for the addition of Brakhage and Keelin as Settling Defendants, there is no dispute that these modified terms represent the actual agreement of the parties. The Court finds that disclosure of the source of the Settlement Amount and the relative shares of the Settlement Amount paid by the Settling Defendants is not a material term of the agreement.

**2. MATERIAL TERM #2 — The Settlement Amount is to be placed in escrow with the Talon Group in Salt Lake City within 24 hours of the Plaintiffs' execution of a written settlement agreement.**

This term is also not in dispute, although the procedural posture of the Motion renders superfluous the execution of a written settlement document and the escrow timing associated therewith. Thus, the only remaining relevant aspect of material term #2 is that the Settlement Amount be placed in escrow with the Talon Group in Salt Lake City.[11]

**3. MATERIAL TERM #3 — If the Settlement Amount is not placed in escrow with the Talon Group once such placement is required, then all of the Settling Defendants will execute and enter stipulated judgments in the appropriate cases. The Plaintiffs shall retain the unilateral option to continue litigation if they do not wish to enforce such stipulated judgments.[12]**

There is no dispute that material term #3, as found by the Court, was an agreed material provision of the settlement on April 28; however, this term is now the subject of a heated dispute between the parties. Jensen testified that Johnson agreed to a modification requiring only the Debtor's father Charles Ross Anderson to execute a stipulated judgment in the event of default by the Settling Defendants. Johnson admits that he and Jensen discussed the proposal but denies that he ever consented to such a modification. The Court is unable to determine by a

---

[11] The Court notes that although the draft Settlement Agreement and attached Escrow Agreement contemplate the dismissal of all pending actions related to Shaw's False Claims Act litigation before distribution of the Settlement Amount to the Plaintiffs, no evidence or argument was presented on this point as it relates to the material terms of the parties' oral agreement. But it is implicit that all material terms of the parties' agreement, including the dismissal of all pending actions, must be completed before funds would be released from escrow.

[12] Johnson testified at some length to his disapproval of the phrase "offer of judgment" in the draft agreement. Although Johnson did not specifically reference the Federal Rules of Civil Procedure in his testimony, the gist of his complaint was that offers of judgment are specifically defined procedural mechanisms under Federal Rule of Civil Procedure 68. There is no question that the parties orally agreed that stipulated judgments would be entered against the Settling Defendants in the event of default in tendering the Settlement Amount, not that Rule 68's offer of judgment procedures would be invoked.

preponderance of the evidence that the parties actually agreed to such a modification and finds that no such change in the material terms of the April 28 agreement ever occurred, yet language to this effect was included in the May 4 draft.[13]

**4. MATERIAL TERM #4 — The settlement agreement does not compromise or otherwise affect any claims that the United States may have against the Settling Defendants.**

This term was also the subject of heated dispute, but only because the draft did not properly memorialize it. Jensen testified that the parties agreed specifically to a "best efforts" approach in obtaining any necessary Government approvals, while Johnson testified more generally that it would be up to the Settling Defendants to figure out any Government-related matters because neither of them really knew what would be involved. Either way, it is clear that the parties did not agree to any releases of any claims held by the United States against the Settling Defendants as part of the consideration for the settlement.

But the May 4 draft did include several instances of such language in contradiction to the oral agreement's terms. In response to a Limited Objection filed by the United States to the Motion, the draft was modified and is attached as an exhibit to the Debtor's Supplemental Filing in Response to the United States' Limited Objection to Motion to Enforce Settlement Agreement. The United States subsequently withdrew its Limited Objection. Ultimately, these changes in the written draft are irrelevant because the Court is dealing with the terms of an oral agreement, but they do clarify that the United States is not a party to the settlement.

---

[13] Although irrelevant to resolution of the Motion, the Court notes that the Settlement Amount is apparently ready to be paid to the Plaintiffs pending the outcome of this Court's ruling, so the stipulated judgment provisions of the settlement agreement will likely be moot.

**5. MATERIAL TERM #5** — **The Settling Defendants are required, along with the Plaintiffs, to jointly move for the removal of all sanctions entered against the Plaintiffs and to use their best efforts to obtain such removal. The Settling Defendants must also cease prosecution of any further sanction requests.**

By far, this term is the subject of the most intense debate between the parties, and Barringer-Thomson herself stated that it was the sanction-related provisions in the May 4 draft that were most infuriating to her. Although Jensen testified briefly on direct examination that the Settling Defendants agreed to not oppose any efforts by the Plaintiffs to have Barringer-Thomson's sanctions removed, Jensen expanded his testimony on cross-examination to indicate that a best efforts standard was applicable in seeking removal of the sanctions. Johnson, on the other hand, initially testified that the oral agreement required all sanctions to *actually* be removed before any settlement would become effective. He then clarified that he only "emphasiz[ed]" to Jensen the Plaintiffs' desire to have the sanctions removed but admitted that actual success in vacating all sanctions orders against the Plaintiffs was not required under the terms of the oral agreement. For her own part, Barringer-Thomson made some reference to actual removal of sanctions against her but emphasized the best efforts standard in her cross-examination of Jensen.

It is clear to the Court that actual expungement of all sanctions was not a material term of the agreement, but it is equally clear that more than a lack of objection by the Settling Defendants is required. The draft Settlement Agreement is inconsistent with the oral agreement's terms insofar as it provides only for the Settling Defendants' lack of objection to any requests that the Plaintiffs might make to the appropriate courts to have sanctions against the Plaintiffs vacated.

Depending on the particular case, the relevant Settling Defendants are required to stipulate and move jointly with the Plaintiffs in seeking vacatur of sanctions against the Plaintiffs; however, refusal by any court to grant the parties' requested relief will not affect the validity of the settlement agreement.

**6. MATERIAL TERM #6** — **The Plaintiffs and Settling Defendants shall mutually release each other from any and all claims related to the *qui tam* and associated litigation, including the execution of all required satisfactions of judgment and releases of extant judgment liens.**

This term is undisputed. The oral settlement agreement is global both in the sense of encompassing all parties to the Plaintiffs' various lawsuits and all claims related in any way to those lawsuits.

**7. MATERIAL TERM #7** — **The Settling Defendants are responsible for drafting and filing all required documents to effectuate the settlement including all satisfactions of judgment, releases of judgment liens, and joint motions to remove sanctions and dismiss cases.**

This term is not disputed, yet the draft agreement contained some provisions requiring the Plaintiffs to file certain documents. The Debtor agreed at the hearing that the Plaintiffs were not required to draft or file any settlement-related documents, although the Plaintiffs must obviously make reasonable efforts at reviewing and responding to the documents prepared by the Settling Defendants. Also, Barringer-Thomson made some attempt in both her written pleadings and at the hearing to claim that it was a material term of the oral agreement that a written draft would be prepared and transmitted to her by May 1, 2006. The undisputed evidence is to the contrary,

however, based on the representations made in the Notice and the testimony of both Johnson and Gray. The Court finds no requirement that the Settling Defendants were to have prepared and transmitted a draft of the Settlement Agreement by May 1, 2006.

### 8. "COLLATERAL" TERMS

Johnson testified to several other areas of discord between the oral and written agreements, mostly with respect to boilerplate language that was neither particularly offensive to him nor specifically authorized. For example, the draft agreement includes a provision requiring the Plaintiffs to pay their own taxes upon receipt of the Settlement Amount and another provision regarding confidentiality about which neither side truly cared. The Debtor suggests that such provisions are "collateral terms" that can be enforced in conjunction with the material terms of the agreement, but the Court declines such an invitation. Again, the Court's function with respect to the Motion is to determine the material terms of the parties' oral agreement. Additional terms upon which the parties did not specifically agree, even if truly "collateral," may not and will not be added.

### III.  ENFORCEMENT

With the existence of the agreement established and its material substance defined, the Court must now make a determination as to whether the agreement should be enforced against the parties to this adversary proceeding under Utah law. As stated earlier, Utah courts will enforce binding oral agreements if "the excuse for nonperformance is comparatively insubstantial." The parties spent much time at the hearing asserting blame as to whose "fault" it was for causing the breakdown in papering the terms of the oral settlement agreement, but that issue is tangential at best and neither side is blameless. The Court can simply think of few

excuses for nonperformance that are less "comparatively substantial" than the events following the oral agreement being reached, and particularly the events following Barringer-Thomson's first receipt of the draft Settlement Agreement on May 4, 2006. Accordingly, the Court finds that enforcement of the settlement agreement is appropriate under substantive Utah law.

But while this Court is bound to apply Utah's substantive law of contracts, the Court also believes that it is required to make a separate, if procedurally odd, determination as to whether approval of the oral settlement agreement is appropriate under Federal Rule of Bankruptcy Procedure 9019 and the four-factor test first enunciated in *In re Kopexa Realty Venture Company*.[14] These factors are (1) the chance of success on the litigation on the merits; (2) possible problems in collecting the judgment; (3) the expense and complexity of the litigation; and (4) the interests of the creditors in deference to their reasonable views.[15] In performing this analysis, the Court is not required to hold a "mini-trial" on the litigation.[16] The Court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness" in order to determine whether the settlement is "fair and equitable" and in the best interests of the estate.[17]

The Court finds that all four *Kopexa* factors weigh strongly in favor of the settlement's approval. The Second Amended Complaint asserts nondischargeability causes of action under

---

[14] 213 B.R. 1020 (10th Cir. BAP 1997).

[15] *Id.*, 213 B.R. at 1022.

[16] *See, e.g.*, *Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582 (7th Cir. 1994); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991).

[17] *Drexel Burnham Lambert*, 134 B.R. at 495-97 (internal quotes omitted).

§ 523(a)(4) for the Debtor's alleged fraud and/or defalcation while acting in a fiduciary capacity and under § 523(a)(6) for alleged willful and malicious injury to the Plaintiffs caused by the Debtor.[18] These causes of action are related to the Debtor's alleged efforts to prevent Shaw from collecting on the False Claims Act judgment for fees and costs entered against AAA, Brakhage, and Keelin by funneling AAA's assets to a new entity named Azimuth, Inc. (Azimuth). This litigation is quite complex and success on the merits is far from certain, particularly given the difficulty in establishing the Debtor's liability for the alleged acts of AAA and Azimuth and given the recent adverse judgments to Shaw in both the Western District of Oklahoma and the Tenth Circuit in her attempts to impose False Claims Act liability on various individuals including the Debtor. Based on several deadline extensions in this adversary proceeding and after numerous hearings on motions to compel and quash, discovery has not even now been fully completed although the case was nearing readiness for trial at the time the Notice was filed. It is also clear from Shaw's many years of effort in attempting to collect on the False Claims Act judgment for fees and costs that problems may arise in collection, and the Debtor is in a Chapter 7 bankruptcy case. Finally, the settlement serves the interests of the Chapter 7 estate and its creditors insofar as it resolves the Trustee's Objection to Proof of Claim #13 and Limited Objection to Motion for Relief from Stay and expedites administration of the estate without further costs and expenses being incurred by the Trustee. In light of the circumstances of this

---

[18] The Plaintiffs also attempt in the Second Amended Complaint to reserve their rights to assert additional causes of action under § 523(a)(2) if they prevail in certain prior-pending litigation. These additional causes of action have not been formally asserted to date; in fact, the automatic stay has not yet been lifted to permit the Plaintiffs to go forward with any litigation against the Debtor.

case and the terms of the settlement, the Court finds that the settlement satisfies the *Kopexa* standard and shall be approved.

## IV.  REQUEST FOR FEES

Finally, the Debtor requests an award of fees incurred in connection with the Motion under § 105(a) of the Bankruptcy Code as sanctions for the Plaintiffs' alleged abused of the judicial process.  The Court finds it extremely unfortunate that the rancor and mistrust that has grown between the parties to this litigation and the False Claims Act litigation led to the necessity of an evidentiary hearing on whether a settlement agreement was even reached.  Despite the contentions in the Plaintiffs' pleadings, there were actually precious few points of disagreement between the parties once all the evidence and argument was presented at the hearing.  This is not to say that these points of disagreement are unimportant, just that the parties could and should have been able to put the oral settlement agreement in writing without this Court's intervention.  But, as stated earlier, neither side is blameless for the litigants' inability to memorialize a relatively straightforward oral settlement agreement.  Whether through miscommunication, hurriedness, or otherwise, the Debtor's draft Settlement Agreement did not accord with all the material terms of the oral settlement agreement, yet Barringer-Thomson's extreme response to the draft's inconsistencies was not indicative of her "best efforts" at reaching an appropriate resolution.  Although the Court believes that both sides could have done more to resolve this matter without the need for a hearing, the Court does not find that either side committed an abuse of process sufficient to award sanctions under § 105(a).  Each party shall bear its own fees and costs incurred in connection with the Motion.

## V.  CONCLUSION

For all the foregoing reasons, the material terms of the oral settlement agreement as found by the Court and as set forth above are approved and shall be enforced against all parties to this adversary proceeding.  The amount of $254,900 shall be tendered forthwith into escrow with the Talon Group in Salt Lake City, and the Debtor shall file a notice with the Court to that effect within five days of the transfer being completed with service of the notice to the Plaintiffs.  This adversary proceeding will then be dismissed with prejudice, but the Court will retain jurisdiction to consider a joint motion filed by the Plaintiffs and the Debtor to remove the sanctions against the Plaintiffs for discovery abuse.  Of course, should the Plaintiffs' or Settling Defendants' subsequent conduct necessitate any further enforcement of the settlement agreement outside the context of this adversary proceeding, any such efforts must be made in the appropriate Oklahoma court or other court.  A separate Order Enforcing Settlement shall issue.

------------------------------------END OF DOCUMENT-------------------------------------



_____ooo0ooo_____

# SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION ON DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AND REQUEST FOR ATTORNEY FEES** will be effected through the Bankruptcy Noticing Center to each party listed below.

Glenn R. Bronson
Prince Yeates & Geldzahler
City Centre I, Suite 900
175 East 400 South
Salt Lake City, UT 84111

Jory L. Trease
9 Exchange Place
Suite 300
Salt Lake City, UT 84111

Michael D. Gray
Britton Ramsey & Gray, P.C.
700 Corporate Tower
101 N. Robinson
Oklahoma City, OK 73102

Marilyn D. Barringer-Thomson
P.O. 54444
Oklahoma, OK 73154

Daniel D. Price
U.S. Attorney's Office
185 South State Street
Suite 400
Salt Lake City, UT 84111

Stephen W. Rupp
170 South Main Street
Suite 800
Salt Lake City, UT 84101